Stuart M. Richter (CA 126231)
stuart.richter@kattenlaw.com
Gregory S. Korman (CA 216931)
greg.korman@kattenlaw.com
Andrew J. Demko (CA 247320)
andrew.demko@kattenlaw.com
**KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East
Los Angeles, CA 90067-3012
Telephone:    310.788.4400
Facsimile:     310.788.4471

Attorneys for Defendants BBVA Compass Bancshares, Inc., Simple Finance Technology Corp., BBVA Compass Financial Corporation, and Compass Bank

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (OAKLAND COURTHOUSE)

| | |
|---|---|
| AMITABHO CHATTOPADHYAY, UNITE THE PEOPLE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BBVA COMPASS BANCSHARES, INC., SIMPLE FINANCE TECHNOLOGY CORP., BBVA COMPASS FINANCIAL CORPORATION, and COMPASS BANK,<br><br>Defendants. | Case No. 4:19-cv-01541-JST<br><br>The Honorable Jon S. Tigar<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT PURSUANT TO RULES 12(b)(2) AND 12(b)(6)**<br><br>[Opposition to Plaintiff's Request for Judicial Notice filed concurrently herewith]<br><br>Complaint Filed: March 25, 2019<br><br>Date:     October 2, 2019<br>Time:    2:00 p.m.<br>Place:    Courtroom 6, 2nd Floor<br>              Oakland Courthouse |

# TABLE OF CONTENTS

I.   Summary of Reply ..........................................................................................................1

II.  Plaintiff's Section 1981 Claim Fails as a Matter of Law Because She Has Sued over Defendants' Compliance with the Bank Secrecy Act and Its Implementing Regulations. ....................................................................................................................4

   A.   Plaintiff's Section 1981 claim fails because the Bank Secrecy Act is a more specific statute and therefore controls.................................................................4

   B.   Plaintiff's Section 1981 claim is not plausible because Defendants were complying with the Bank Secrecy Act, not discriminating .....................................7

   C.   Plaintiff fails to distinguish between the regulations governing account opening and identity verification. .........................................................................10

III. Plaintiff's Unruh Act Claim Fails as a Matter of Law Because the Policies Plaintiff Challenges Further Public Policy and Are Non-Arbitrary...................................11

IV.  The BBVA Defendants Should Be Dismissed Because This Court Lacks Personal Jurisdiction over Them and Because No Facts Are Pleaded against Them. .........13

   A.   The BBVA Defendants are not subject to personal jurisdiction.............................13

   B.   Plaintiff's claims against the BBVA Defendants fail because she pleads no facts against them..................................................................................................14

V.   Conclusion...................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Brown v. 140 NM LLC*,
   No. 17-cv-05782-JSW, 2019 WL 118425 (N.D. Cal. Jan. 7, 2019).........................................13

*Brown v. GSA*,
   425 U.S. 820 (1976).....................................................................................................................4

*Calder v. Jones*,
   465 U.S. 783 (1984)...................................................................................................................14

*Dasrath v. Continental Airlines, Inc.*,
   467 F. Supp. 2d 431 (D.N.J. 2006) .............................................................................................8

*Innerlite, Inc. v. Zirc Dental Prod., Inc.*,
   No. 13-7501, 2014 WL 12601024 (C.D. Cal. Sept. 2, 2014) .....................................................15

*Koire v. Metro Car Wash*,
   40 Cal. 3d 24 (1985) .................................................................................................................11

*Lazar v. Hertz Corp.*,
   69 Cal. App. 4th 1494 (1999) ...................................................................................................12

*Penny Newman Grain Co. v. Midwest Paint Servs., Inc.*,
   Case No. No. CV-F-06-1020 OWW/DLB, 2007 WL 4531700, (E.D. Cal. Dec. 18, 2007) ..................................................................................................................................14

*Perez v. Wells Fargo & Co.*,
   No. 17-CV00454-MMC, 2017..................................................................................................9

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012)....................................................................................................................5

*Reddy v. Medquist, Inc.*,
   No. CV 10-1830-VBF, 2010 WL 11595765 (C.D. Cal. Apr. 29, 2010) ...................................13

*Sargoy v. Resolution Tr. Corp.*,
   8 Cal. App. 4th 1039 (1992) .....................................................................................................11

*United States v. 103 Elec. Gambling Devices*,
   223 F.3d 1091 (9th Cir. 2000) ....................................................................................................5

*Walden v. Fiore*,
   571 U.S. 277 (2014)...................................................................................................................13

*Williams v. Trans World Airlines*,
   509 F.2d 942 (2d Cir. 1975) ................................................................................................ 8

**Statutes**

42 U.S.C. § 1981 ................................................................................................................. *passim*

49 U.S.C. § 44902 ......................................................................................................................... 8

31 U.S.C. §§ 5311 *et seq*., Bank Secrecy Act ................................................................... *passim*

Cal. Civ. Code §§ 51 *et seq*., Unruh Civil Rights Act ........................................................ 3, 12, 13

**Rules**

Fed. R. Civ. P. Rule 8 ............................................................................................................ 2, 8, 9

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 14

**Regulations**

31 C.F.R. § 1020.220(a)(2) ................................................................................................. *passim*

Exec. Order No. 11,935, 5 C.F.R. § 7.3 (1976) ........................................................................... 7

**Other Authorities**

https://www.fincen.gov/news-room/enforcement-actions (last accessed Aug. 27, 2019) ........................................................................................................................... 3

U.S. Const. Article II, § 1, cl. 6 ................................................................................................... 7

## I. SUMMARY OF REPLY

By Congressional and regulatory mandate, defendants Simple Financial Technology Corp. ("Simple") and Compass Bank ("Compass," together, "Defendants") are required to aid in the prevention of money laundering and terrorist financing by crafting a Customer Identification Program ("CIP") tailored to the particular risks of their business. Because Simple is an online-only deposit platform with no branches, Defendants are unable to physically verify an applicant's identity the way traditional brick-and-mortar branches can: by inspecting original documents and requiring in-person meetings to confirm the applicant actually is who she says she is, and not someone with a stolen Social Security Number sitting behind a computer screen, somewhere overseas, out to commit fraud or worse.

Federal law requires Defendants to take into account these particular circumstances in creating the risk-based CIP procedures they will use to verify the identity of customers who apply online for deposit accounts. Defendants' procedures must be "based on the bank's assessment of the relevant risks, including those presented by various types of accounts maintained by the bank, the various methods of opening accounts provided by the bank, the various types of identifying information available, and the bank's size, location, and customer base." 31 C.F.R. § 1020.220(a)(2). The regulations also require that Defendants' CIP "must include procedures for responding to circumstances in which the bank cannot form a reasonable belief that it knows the true identity of a customer," including those circumstances "[w]hen the bank should *not* open an account." *Id.* § 1020.220(a)(2)(iii)(A) (emphasis added).

In other words, the regulations confer on Defendants the discretion to decline to open accounts when they determine the identity of the proposed customer cannot be verified. Here, Defendants determined that, based on the circumstances, the technology, and the nature of Simple's online-only business, they could not verify the identity of a non-citizen. For Defendants to have ignored this determination and proceeded to open accounts anyway would have violated the specific federal law governing their business operations. They could not, would not, and did not do that. Yet that is exactly what Plaintiff expected Defendants to have

done, based on her personal opinion about what constitutes "good-enough compliance" with these national security regulations.

Deploying over-the-top rhetoric, Plaintiff claims that Defendants are "obsessed with the 'alien-ness' of non-citizens," and consider non-citizens to be "gangsters, foreign dictators, or other nefarious characters." (Opp. at 6–7.) She asserts that her own lawsuit is foolish because Defendants "may just steal [non-citizens'] money after the fact and hope that the affected individuals are too afraid or lack the resources to sue." (*Id*.) These baseless statements have no place in this Court and, moreover, they lack any semblance of logic. Defendants are for-profit financial institutions that want as many depositors as possible because that is how they make money—Defendants do not want to turn away new customers, they want to add them. If Defendants could have accepted Plaintiff (or any applicant) with confidence that they were complying with their federal obligations, they would have done so. To assert otherwise defies common sense and lacks the plausibility required by Rule 8. Plaintiff's related accusations of corporate xenophobia are equally preposterous. Defendants are part of an *international* banking group, headquartered in Spain, with operations around the world. Her assertion that members of a non-U.S.-based international banking group would discriminate against non-U.S. citizens is not plausible.

For all her rhetoric, Plaintiff never actually addresses, much less denies, the identity-verification problem that Defendants face. She just argues Defendants should rely on the government's issuance of a Social Security Number as a proxy for verifying her identity. But a Social Security Number typed into a website does not by itself verify identity—identity thieves prove that every day. Nor do the Bank Secrecy Act's ("BSA") implementing regulations allow Defendants to rely on someone else's verification of Plaintiff's identity, not even the government's. Defendants are obliged to develop and implement their *own* risk-based procedures to verify an applicant's identity. The regulations never say, "if someone has a Social Security Number, no further identity verification is necessary." Rather, a non-citizen's tax ID or other identification number is among the bare minimum of information required to open an account.

Finally, Plaintiff fails to appreciate that Defendants must not only confirm a customer's identity at the time the account is opened, 31 C.F.R. § 1020.220(a)(2)(i)(A), they must also *verify* the customer's identity "within a reasonable time after the account is opened," 31 C.F.R. § 1020.220(a)(2)(ii). The regulation governing account *opening* requires, at minimum, an identification number like a Social Security Number; the regulation governing post-opening identity *verification* requires Defendants to use that Social Security Number to dig deeper. Because there are two separate regulations, one requiring Defendants to identity an applicant and another requiring Defendants to verify the applicant's identity, they cannot be treated the same. Plaintiff's position that providing a Social Security Number alone is sufficient to *verify* identity is wrong.

Against this backdrop, Plaintiff's claims should be dismissed. Her claim under Section 1981 fails as a matter of law because the conduct she alleges was not actionable discrimination, it was mandatory compliance with the BSA's implementing regulations governing the opening of accounts and the verification of potential customer identities. Her claim under the Unruh Act also fails as a matter of law because the challenged policy of customer verification is not arbitrary; it furthers the compelling social policy of national security generally, and preventing terrorist financing and money laundering specifically, as codified by Congress in the BSA and the Department of the Treasury in its implementing regulations.[1]

These defects are fatal to all Plaintiff's claims, but her claims against BBVA Compass Bancshares, Inc. and BBVA Compass Financial Corporation (the "BBVA Defendants") fail for two additional reasons.[2] First, this Court lacks personal jurisdiction over them because neither engages in banking activities in California or anywhere else. Second, the Complaint pleads no factual allegations linking these entities to the conduct giving rise to this lawsuit.

---

[1] The Financial Crimes Enforcement Network, or "FinCEN," is the Treasury Department agency responsible for enforcing the requirements of the Bank Secrecy Act. FinCEN has actively pursued enforcement actions against money services businesses, securities businesses, casinos, and depository institutions for non-compliance with BSA requirements. *See* https://www.fincen.gov/news-room/enforcement-actions (last accessed Aug. 27, 2019).

[2] Throughout this reply, "Defendants" shall refer to Simple and Compass, and not the BBVA Defendants, which are not subject to personal jurisdiction.

1    Plaintiff thinks she knows better than Defendants the difficulties they face in verifying non-citizens' identities, and believes her view of what is sufficient to ensure national security should control. But Congress and the Department of the Treasury gave that responsibility to Defendants, not Plaintiff. Imposing liability here puts online-only financial institutions between an impossible rock and a hard place—either honor their BSA obligations and face a class action, or relax their BSA compliance obligations and risk a governmental enforcement action and massive fines. Letting this case move beyond the pleadings stage puts all financial institutions operating in the online space in this untenable position. This is bad for the economy, bad for online-only financial service providers and the emerging FinTech industry, and bad for consumers.

There was no discrimination here. The Complaint should be dismissed without leave to amend.

## II. PLAINTIFF'S SECTION 1981 CLAIM FAILS AS A MATTER OF LAW BECAUSE SHE HAS SUED OVER DEFENDANTS' COMPLIANCE WITH THE BANK SECRECY ACT AND ITS IMPLEMENTING REGULATIONS.

### A. Plaintiff's Section 1981 claim fails because the Bank Secrecy Act is a more specific statute and therefore controls.

Plaintiff does not dispute that the BSA and its implementing regulations *specifically* govern the procedures Defendants must develop for verifying the identity of non-citizens applying for accounts, while Section 1981, in contrast, *generally* prohibits discrimination in the making of contracts. As explained in the moving papers, liability under the more general statute may not be imposed based on Defendants' compliance with the more specific BSA and its requirements. *See Brown v. GSA*, 425 U.S. 820, 834 (1976) ("In a variety of contexts the Court has held that a precisely drawn, detailed statute pre-empts more general remedies."). Put another way, the more precisely and narrowly drawn BSA governs over the broader and more general Section 1981. (ECF No. 19, at 8–12.)

Plaintiff argues this canon of interpretation applies only when compliance with the more general statute and the more specific one is literally impossible. (Opp. at 5.)[3] But she is wrong.  The Supreme Court has instructed: "[W]e know of no authority for the proposition that the canon is confined to situations in which the entirety of the specific provision is a 'subset' of the general one . . . What counts for application of the general/specific canon is not the *nature* of the provisions' prescriptions but their *scope*." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 648 (2012). Indeed, the Ninth Circuit has held that when the more specific provision regulates the particular conduct in question and is in tension with the more general edict, the specific provision governs even where it would be theoretically *possible* for the defendant to comply with the more general one. *United States v. 103 Elec. Gambling Devices,* 223 F.3d 1091 (9th Cir. 2000).

In *103 Electric Gambling Devices*—a case Plaintiff does not attempt to distinguish—the government brought a forfeiture action against some electronic gaming machines, arguing they were "gambling devices" on Native American land and therefore required a tribal-state compact under the Johnson Act. *Id*. at 1093. But another statute, the Indian Gaming Regulatory Act ("IGRA"), permitted games on Native American land without a tribal-state compact if the games qualified as "bingo" under the IGRA. *Id*. The court held the games met the IGRA's more specific description of "bingo," placing the games outside the purview of the Johnson Act, a statute that applied generally to all gambling devices. *Id*. at 1102–03. Compliance with both statutes was certainly *possible*—a tribal-state compact could be entered into even if the game met the requirements to be considered "bingo" under the IGRA—but the Ninth Circuit held that "Congress's most recent relevant word on" the subject is what governs, and it must accordingly be given effect. *Id*. Thus, Plaintiff's position is incorrect that compliance with both the BSA and Section 1981 must be literally impossible before the Court can determine that the BSA, Congress's most relevant word on what banks must do to vet customers, is not discrimination under Section 1981. Instead, the BSA must be given effect.

---

[3] Plaintiff's reference to the test for repeal by implication is misguided and irrelevant. (Opp. at 3.) No one argues the BSA impliedly repealed Section 1981.

Ignoring the BSA's requirements, Plaintiff argues Defendants must treat all non-citizen account applicants exactly "the same as they would treat a citizen." (Opp. at 3.) She also argues that Defendants' policies are based merely on "stereotypes" about non-U.S. citizens. (*Id.* at 6.) But identical treatment is not required by law. In the BSA's regulations, citizenship expressly is one of the data points mentioned in the context of identity verification—contrary to Plaintiff's view, those regulations do *not* treat non-citizens the same as citizens; the regulations distinguish between them. 31 C.F.R. § 1020.220(a)(2)(i)(A)(4)(i), (ii).[4] Indeed, financial institutions are afforded the flexibility to craft their CIPs taking into account (a) the types of documents that may be presented, (b) limitations on the bank's ability to scrutinize the documents based on the particular business model, and (c) *relevant* differences between citizens and non-citizens. Because the BSA and its implementing regulations allow Defendants and other financial institutions to treat non-citizens differently from citizens when verifying the identity of new applicants, the more general anti-discrimination mandate of Section 1981 must yield to the more specific regime of the BSA.

Plaintiff surmises that Defendants are familiar with the documents the putative class members will offer to verify their identity, listing a variety of U.S. documents she claims "non-citizens with social security numbers *have*[.]" (Opp. at 6 (emphasis added).) This is at best disingenuous; she lists only documents that a non-citizen with a Social Security Number may *apply* for—no authority requires such persons to submit such an application or guarantees that, if they applied, they would get the documents. For instance, someone may apply for an employment authorization card or a state-issued driver's license, but the Court cannot assume that every non-citizen with a Social Security Number "has" one, as Plaintiff claims. What is more, the argument appears based on Plaintiff's counsel's own authority. (*See*

---

[4] Plaintiff concedes, as she must, that the regulation distinguishes between citizens and non-citizens, but says this "was intended to *avoid* the discrimination Defendants say the BSA legalized." For this facile conclusion she cites no legislative history or other valid indicia of congressional intent. And there would be none. The regulations must be read in the context of the overall statutory scheme, and that context is that Congress made financial institutions partners in the war on terror and conferred on them significant discretion in crafting a CIP that meets the BSA's requirements.

ECF No. 32-2 at ¶ 3 (stating Plaintiff's counsel's conclusory, unsupported opinion "that all factual contentions made in support of my attached motion are true and correct").) This is another example of Plaintiff attempting to arrogate to herself the final word on what procedures should or should not be part of Defendants' CIP. And her premise is flawed, as the mere fact that an applicant can supply a Social Security Number, however procured, does not satisfy Defendants' statutory and regulatory customer identity verification requirements.

Plaintiff also speculates that unspecified "government agencies and other banks" "generally accept[]" some or all of the documents Plaintiff's counsel supposes non-citizens may have. Yet whether or not a particular governmental agency accepts an identity document for one purpose (for instance, assessing an asylum application) has no bearing upon whether a financial institution would or should accept the same document for the purpose of verifying a person's identity under the BSA's regulatory regime.

Section 1981 imposes a critical but *general* regulation on all businesses; the BSA and its implementing regulations impose a *specific* regulation upon financial institutions only. Because the BSA's rules are more specific than Section 1981's general rules, the BSA's rules control. Plaintiff's claim that Defendants violated Section 1981 by complying with those rules fails as a matter of law.

**B.    Plaintiff's Section 1981 claim is not plausible because Defendants were complying with the Bank Secrecy Act, not discriminating.**

Plaintiff's interpretation of Section 1981 as absolutely forbidding any differential treatment of a protected class is an implausible oversimplification. Differential treatment between citizens and non-citizens appears throughout federal law, starting with the Constitution itself, which restricts the Office of the President to natural born citizens. U.S. Const. art. II, § 1, cl. 6 ("No Person except a natural born Citizen, or a Citizen of the United States . . . shall be eligible to the Office of the President"). Similarly, only United States citizens and nationals may be appointed to competitive service federal jobs. Exec. Order No. 11,935, 5 C.F.R. § 7.3 (1976).

Plaintiff's strained comparisons to landlords and the Americans with Disabilities Act regulations are inapt. (Opp. at 4–5.) The BSA recognizes and builds in the flexibility financial institutions need to craft identity-verification procedures that meet national security concerns and account for the particular circumstances and risks those institutions face. Unlike other areas of law, the BSA and its regulations place the burden of protecting against money laundering and terrorism directly onto the financial institutions themselves. This weighty responsibility, coupled with the risk of enforcement and sanctions in the face of non-compliance, means Defendants must implement careful, conscientious, and robust internal processes and procedures. Plaintiff's position that a financial institution cautiously crafting those processes and procedures is discriminating against her rather than complying with its legal obligations is implausible under Rule 8.

The closest industry analog with a similarly direct responsibility for public safety in the face of potential terrorism is the airline industry. Congress gives airlines the discretion to refuse to transport (*i.e.*, eject) passengers whom the carrier decides might be inimical to safety. (Mot. at 14–15); 49 U.S.C. § 44902. Plaintiff argues the airline cases are not relevant, but they show that no liability should be imposed for compliance with federal law even if a plaintiff later argues it was discriminatory. As pilots and airline carriers are responsible for the safety of their passengers, so are financial institutions on the frontline of the nation's defense against money laundering and terrorist financing networks. And just as the airlines are permitted to exercise discretion in "the ascertainment of the necessity for denying passage to one seeking it," *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975); *Dasrath v. Continental Airlines, Inc*., 467 F. Supp. 2d 431, 445–49 (D.N.J. 2006), so too are Defendants permitted—indeed, required—to exercise discretion in crafting their CIP and in deciding whether they can or cannot verify an applicant's identity.

Plaintiff also tries to distinguish the airline cases on the basis that airline personnel make the challenged decisions on a case-by-case basis. But this proves the whole point: the airline carriers had the benefit of *in-person observation* of the plaintiffs' behavior. Simple, by contrast, operates exclusively online; it lacks the opportunity to interact with prospective

account holders, to consider their demeanor, or to review their original identification documents. Defendants must make decisions that impact national security within these constraints, which the regulations recognize by conferring discretion and flexibility in formulation of internal CIP procedures.[5]

Finally, Plaintiff argues that Defendants espouse "repugnant stereotypes and irrational fears . . . that non-citizens with valid social security numbers pose a greater risk of terrorist or money-laundering activities" than U.S. citizens. (Opp. at 8.) Defendants do nothing of the sort. The point is that the *true identities* of non-citizens may be *harder for Defendants to assess* than with respect to citizens, for all of the reasons already discussed: the identity documents may be unfamiliar, the plain text of the regulations permits, if not requires, citizenship to be a factor that affects the vetting process, and an online-only bank is limited in the ways it can verify a prospective customer's identity.

This same misapprehension leads Plaintiff to argue that the motion delves into factual matters outside the pleadings, because she claims the allegations do not speak to whether non-citizens with Social Security Numbers pose a higher security risk than citizens. (Opp. at 2–3.) Again, whether or not such persons *actually* pose a higher risk is beside the point. What matters is that the BSA and its implementing regulations required Defendants to be confident that they could reasonably verify the identities of non-citizens before opening accounts for them, and required Defendants to exercise their discretion in crafting an appropriate CIP. No outside facts are required to reach that conclusion, because any other reason for turning away new depositors who are non-citizens, other than federal BSA compliance, fails the plausibility test under Rule 8.[6]

---

[5]  Though their reasoning differs, the parties agree that *Perez* lacks any persuasive force here. (Mot. at 10; Opp. at 5 ("Plaintiffs' counsel knows better than to attempt to cite unpublished, pending cases. As such, Plaintiffs feel no need to argue the similarity between this case and *Perez v. Wells Fargo & Co.*, No. 17-CV00454-MMC, 2017 in depth at this juncture.").)

[6]  Plaintiff's accusation of future theft based on a South China Morning Post article reporting on protests in Spain by Chinese residents claiming BBVA froze their accounts under new Spanish anti-money laundering regulations is untoward. The regulations of Spain are not at issue here and the article does not support Plaintiff's inflammatory characterization that BBVA "convert[ed] funds which they held in trust for ordinary Chinese citizens in Spain." (Opp. at 7.) A hearsay news article about events in Spain is irrelevant to this dispute.

### C. Plaintiff fails to distinguish between the regulations governing account opening and identity verification.

Plaintiff argues that she has a Social Security Number, meaning that her identity was already verified by the federal government, so Defendants should have just relied on that. Her position runs counter to logic and the regulations, which she ignores.

For starters, the fact that one has a Social Security Number to type into an online application does not, by itself, verify identity. Social Security Numbers are the targets of identity thieves for this very reason: anyone can use them, especially online. It may be that the federal government performed a comprehensive investigation to issue Plaintiff a Social Security Number at one point in time, but that in no way protects Defendants (or Plaintiff) from the risk that someone might steal her Social Security Number to open an online-only financial account. That heightened risk necessitates heightened vigilance. And the regulations require it.

Plaintiff's erroneous position that a financial institution can discharge its identity verification obligations with a Social Security Number alone stems from her conflation of two distinct parts of the applicable regulation. One section requires the development of procedures "for *opening* an account that specify the identifying information that will be obtained from each customer." 31 C.F.R. § 1020.220(a)(2)(i)(A) (emphasis added). This section includes an identification number like a Social Security Number among the minimum information required to open an account, which for non-citizens shall be one or more of "[a] taxpayer identification number; passport number and country of issuance; alien identification card number; or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard." *Id.* § 1020.220(a)(2)(i)(A)(4)(ii).

Plaintiff ignores entirely the *other* section of the regulation requiring Defendants to develop "procedures for verifying the identity of the customer, using information obtained in accordance with paragraph (a)(2)(i) of this section, within a reasonable time *after* the account is opened." 31 C.F.R. § 1020.220(a)(2)(ii) (emphasis added). This section establishes by its

terms that Defendants cannot rely solely on a Social Security Number. It requires financial institutions to *take* the information initially obtained at the time of account opening (including the Social Security Number) and *use it to verify the customer's identity*. It is here that Plaintiff's arguments fall apart, because the regulations governing the verification stage is tailored to very circumstances Defendants face. That regulation contemplates—and requires Defendants to develop CIP procedures to address—"situations where . . . the bank is not familiar with the documents presented; the account is opened without obtaining documents; the customer opens the account without appearing in person at the bank; and where the bank is otherwise presented with circumstances that increase the risk that the bank will be unable to verify the true identity of a customer through documents." *Id.* § 1020.220(a)(2)(ii)(B)(2).

And finally, directly contrary to Plaintiff's position that Defendants must open an account for her, the regulations expressly authorize Defendants to *decline* to open an account when Defendants "cannot form a reasonable belief that it knows the true identity of a customer." *Id.* § 1020.220(a)(2)(iii)(A) ("These procedures should describe . . . [w]hen the bank should not open an account"). That permissible conduct is exactly what Plaintiff challenges here. At bottom, Plaintiff complains that Defendants' CIP is too cautious. But careful, conscientious, prudent conformity with the BSA's rules and regulations is not discriminatory, it is compliance. Plaintiff's Section 1981 claim should be dismissed.

### III. PLAINTIFF'S UNRUH ACT CLAIM FAILS AS A MATTER OF LAW BECAUSE THE POLICIES PLAINTIFF CHALLENGES FURTHER PUBLIC POLICY AND ARE NON-ARBITRARY.

Dismissal of the Unruh Act claim is required because differential treatment is not actionable if there is a "compelling social policy" favoring it. *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 38 (1985). Further, the Unruh Act "prohibits only arbitrary, invidious or unreasonable discrimination." *Sargoy v. Resolution Tr. Corp.*, 8 Cal. App. 4th 1039, 1043 (1992). Defendants explained that the compelling social policy at issue here is national security, and what Plaintiff would characterize as discrimination was never arbitrary, invidious, or unreasonable. It was instead a reasonable implementation of the obligations

1    imposed on Defendants by the BSA and its regulations. (ECF No. 19, at 16–18.)

2    In her one-paragraph response to this point, citing no authority whatsoever, Plaintiff
3    claims Defendants' policy is arbitrary because there is no evidence that non-citizens pose a
4    higher risk of terrorism or money laundering than do citizens. (ECF No. 32, at 8.) This is a
5    non sequitur that misses the point entirely. Defendants' policy does not assume that U.S.
6    citizens are less likely to be criminals; the opposite may be true. But federal law *requires*
7    Defendants to have confidence in their ability to verify the identity of account applicants—
8    innocent or not—and Defendants determined in their discretion and with knowledge of their
9    own operations that they lacked that confidence when it came to non-citizens. Congress and
10   Treasury made the rules, and neither Plaintiff nor Defendants are empowered, much less
11   qualified, to override them.

12   Plaintiff next argues that a different test applies under the Unruh Act for a claim based
13   on a "total denial of service" versus a claim based on a discount. (Opp. at 9 & n.6.) She cites
14   no authority for this distinction, and she is incorrect. The same standard applies in both
15   circumstances, and that standard holds that there is no liability when, as here, the alleged
16   discrimination is reasonable, non-arbitrary, and justified by policy considerations. *See, e.g.*,
17   *Sargoy*, 8 Cal. App. 4th at 1043, 1045 (affirming order sustaining demurrer to Unruh Act
18   claim alleging age-based complete denial of access to a certain type of bank account because
19   of "policy considerations"); *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1499 (1999)
20   (affirming order sustaining demurrer to Unruh Act claim because a complete "refusal to rent
21   to drivers under age 25" was reasonable and non-arbitrary).

22   Defendants' compliance with their BSA obligations is not a violation of the Unruh Act
23   as a matter of law, and Plaintiff's Unruh Act claim should be dismissed.

1  IV. **THE BBVA DEFENDANTS SHOULD BE DISMISSED BECAUSE THIS COURT
2      LACKS PERSONAL JURISDICTION OVER THEM AND BECAUSE NO FACTS
3      ARE PLEADED AGAINST THEM.**

4  A. **The BBVA Defendants are not subject to personal jurisdiction.**

The Court lacks specific personal jurisdiction over the BBVA Defendants because neither engages in any banking activities whatsoever, let alone in California.[7] BBVA Compass Bancshares, Inc. is a financial holding company with no banking operations, products, or services whatsoever; it is not involved in the day-to-day operations of any its subsidiaries. (ECF No. 18-2 ¶¶ 2–3.  BBVA Compass Financial Corporation is a commercial equipment leasing company that does not engage in any retail banking, has no banking operations, and provides no deposit-taking products or services. (ECF No. 18–1 ¶ 2.) As explained in the BBVA Defendants' motion to dismiss, (ECF No. 18), personal jurisdiction is lacking in these circumstances. *Reddy v. Medquist, Inc.*, No. CV 10-1830-VBF (DTBx), 2010 WL 11595765, at *2 (C.D. Cal. Apr. 29, 2010) (plaintiff did not meet her burden of showing court had general or specific jurisdiction over defendant that was "a holding company with no California operations").

None of Plaintiff's counterarguments has merit. *First*, Plaintiff claims the Court may exercise personal jurisdiction over the BBVA Defendants based solely on her allegation—with no factual support and contrary to the record—that the BBVA Defendants conspired with or are the alter egos of the other Defendants. Plaintiff ignores black-letter law that such allegations are insufficient. *Walden v. Fiore*, 571 U.S. 277, 283 (2014) ("[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum State.") (citation omitted and emphasis in original); *Brown v. 140 NM LLC*, No. 17-cv-05782-JSW, 2019 WL 118425, at *8 (N.D. Cal. Jan. 7, 2019) (finding no specific jurisdiction based on plaintiff's allegations that the defendants "were participating in the same conspiracy as the California defendants").

---

[7] Plaintiff concedes this Court lacks general personal jurisdiction. (ECF No. 32 at 2.)

13
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT
PURSUANT TO RULES 12(b)(2) AND 12(b)(6)

*Second*, Plaintiff requests jurisdictional discovery. But each BBVA Defendant has submitted declarations making it clear that neither had anything to do with anything in California relating to this case. Plaintiff has not controverted these facts nor articulated what facts she expects to discover that would materially affect the outcome of the motion. There is no basis for this fishing expedition.

*Finally*, Plaintiff argues the Court may exert jurisdiction over the BBVA Defendants because they are sophisticated entities represented by the same counsel as the other Defendants. This argument is baseless. Neither choice of counsel nor party sophistication changes the rule that "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). The constitutional personal jurisdiction analysis applies equally to corporate entities as to natural persons, and a party is not required to retain separate counsel to assert a personal jurisdiction defense. *See, e.g.*, *Penny Newman Grain Co. v. Midwest Paint Servs., Inc.*, Case No. No. CV-F-06-1020 OWW/DLB, 2007 WL 4531700, at *13 (E.D. Cal. Dec. 18, 2007) (granting motion to dismiss for lack of personal jurisdiction and noting that "[t]he fact that Norberg is represented by the same attorney representing [another party] does not diminish the burden on Norberg [of litigating in California]").

The BBVA Defendants were improperly named and they should be dismissed for lack of personal jurisdiction.

**B.      Plaintiff's claims against the BBVA Defendants fail because she pleads no facts against them.**

In addition to the absence of personal jurisdiction, Plaintiff's allegations against the BBVA Defendants do not pass muster under Rule 12(b)(6). Plaintiff admits that "specific allegations of discrimination have not been adequately alleged against each and every defendant[.]" (Opp. at 10.) But she claims it is sufficient for her to rest on "a theory of conspiracy," without alleging a single *fact* to suggest a conspiracy exists. (*Id.*) By this logic, a claim against any corporate entity would survive dismissal if a plaintiff conclusorily pleads that the corporate defendant conspired with any other member of its corporate family. That

premise is legally incorrect. *E.g.*, *Innerlite, Inc. v. Zirc Dental Prod., Inc.*, Case No. 13-7501, 2014 WL 12601024, at *5 (C.D. Cal. Sept. 2, 2014) (dismissing holding company because "no facts have been alleged to support a claim" against that specific entity).

The claims against the BBVA Defendants fail as a matter of law, and Plaintiff has not suggested how she could amend the Complaint to state a plausible claim against them based on a conspiracy theory or otherwise. Dismissal is warranted.

## V.   CONCLUSION

For these reasons, and as set forth in the moving papers, Plaintiff's claims should be dismissed without leave to amend.

Dated: September 3, 2019               **KATTEN MUCHIN ROSENMAN LLP**

By: _____/s/ Gregory S. Korman_____

Attorneys for Defendants BBVA Compass Bancshares, Inc., Simple Finance Technology Corp., BBVA Compass Financial Corporation, and Compass Bank

15
DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT
PURSUANT TO RULES 12(b)(2) AND 12(b)(6)